**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHARLES CHRISTOPHER JOHNSON, individually and as the representative of a class of similarly-situated persons, | ) ) ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-5468 |
| | ) | |
| v. | ) | Hon. John Z. Lee |
| | ) | |
| UBER TECHNOLOGIES, INC., | ) | Mag. Young B. Kim |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT UBER TECHNOLOGIES, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**

la-1357714

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................... 1

II.   STATEMENT OF FACTS .......................................................................... 1

      A.    Plaintiff Is A Sophisticated Consumer............................................ 1

      B.    By Creating an Uber Account, Users Agree to the Terms of Service. ................. 2

      C.    Plaintiff Created An Uber Account on July 8, 2013. ........................... 4

      D.    Plaintiff Continued to Use The Uber App After Creating His Account. ............... 4

III.  PROCEDURAL HISTORY........................................................................ 4

IV.   LEGAL STANDARD.............................................................................. 5

V.    PLAINTIFF AGREED TO INDIVIDUALLY ARBITRATE HIS CLAIM. .................... 6

      A.    Uber's Account Creation Process Provided Plaintiff Reasonable Notice of The Agreement................................................ 6

            1.    Numerous Courts Have Confirmed The Validity of Uber's Account Creation Process. .............................. 7

            2.    Numerous Courts Have Entered Arbitration Agreements Involving Substantially Similar Facts. ..................... 8

      B.    Plaintiff Agreed To Uber's Terms of Service When He Created An Account. ................................................... 9

      C.    Plaintiff Use of Uber's Services Confirms He is Bound by the Arbitration Agreement. ................................... 10

      D.    Plaintiff is Bound Even if He Did Not Click On The Hyperlink or Read The Terms of Service............................ 11

      E.    Plaintiff's Inability To Recall Creating His Account Does Not Nullify His Agreement.................................... 13

      F.    The Arbitration Agreement Encompasses Plaintiff's TCPA Claim. .................. 13

VI.   CONCLUSION.................................................................................... 15

## I.    INTRODUCTION

Plaintiff Charles Christopher Johnson agreed to individually arbitrate the claims asserted in this action when he downloaded Uber's mobile application and created an Uber account in July 2013.  Plaintiff does not dispute that he created an Uber account and does not dispute Uber's records showing how that account was created.  Uber's records show that Plaintiff was clearly presented with text stating:  "By creating an Uber account you agree to the Terms of Service & Privacy Policy."  As a matter of law, once Plaintiff clicked the button to create that account (which he does not dispute), he agreed to be bound by Uber's Terms of Service, including the clear and conspicuous agreement to resolve the pending claims in arbitration.

Plaintiff cannot avoid his agreement to arbitrate by claiming that he does not recall the specific process for creating his account, did not read the Terms of Service for which he received notice that he would be bound, did not fully take advantage of the services available to him through the Uber App, or deleted the Uber App from his phone.  None of these arguments can invalidate his binding, unequivocal agreement to arbitrate this claim against Uber on an individual basis.  The Court should grant summary judgment in Uber's favor and compel arbitration.

## II.   STATEMENT OF FACTS

### A.    Plaintiff Is A Sophisticated Consumer.

Plaintiff is a college graduate with two years of coursework toward a post-graduate degree and professional training in user experience design.  SOF ¶ 1.  Plaintiff is currently employed as a free-lancer in animation, production, and art management.  SOF ¶ 2.  Plaintiff's job involves working with technology, software, and mobile apps.  SOF ¶ 3.

Plaintiff has downloaded applications ("apps") on his current and former mobile devices, including some that required him to create an account.  SOF ¶ 4.  Plaintiff expects companies to require consumers to agree to their terms and conditions in connection with providing services.  SOF ¶ 5.  Plaintiff acknowledges that it is common for terms and conditions to be made available through a hyperlink and that the hyperlink puts consumers on notice of the terms and conditions.

1

SOF ¶ 6.  Plaintiff believes that a hyperlink or button is a way that companies can make legal documents "readily available" and "noticeable" to consumers.  SOF ¶ 7.

    **B.**    **Uber Users Agree to the Terms of Service When They Create an Account.**

    Uber is a software technology company that enables third-party transportation providers ("drivers") to receive transportation requests from interested individuals ("riders") through the Uber App.  SOF ¶ 8.  At the time Plaintiff created his Uber account, Uber's sign-up process required users to complete certain steps by clicking through three screens entitled: (1) Create an Account; (2) Create a Profile; and (3) Link Card.  SOF ¶ 9.  No scrolling was required on any of the three screens, and each screen needed to be fully completed before the user could proceed to the following screen.  SOF ¶¶ 10, 11.  Once all the fields were completed on the "Create an Account" and "Create a Profile" screens, the text of the word "Next" in the upper right corner went from grey to **dark black** indicating the user may click on it to submit the information and proceed.  SOF ¶¶ 12-14.  On the final "Link Card" screen (SOF ¶ 15), the following notice and hyperlink appeared:

The words "Terms of Service & Privacy Policy" were called out in a box to indicate the text is hyperlinked.  SOF ¶ 16.  There was no scrolling or swiping necessary for the user to be able to click on and view the "Terms of Service and Privacy Policy."  SOF ¶ 17.  Clicking on the hyperlink directed the user to Uber's Terms of Service in effect at that time.[1]  SOF ¶ 18.

The Terms of Service confirm: "By using or receiving any services supplied to you by [Uber] (collectively, the 'Service') … and downloading, installing, or using any associated application…, you hereby expressly acknowledge and agree to be bound by the terms and conditions of the Agreement[.]"  SOF ¶ 19.  The Terms of Service included the following arbitration provision under the heading entitled "Dispute Resolution:"

> You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, **"Disputes"**) will be settled by binding arbitration …. **You acknowledge and agree that you and Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.**  SOF ¶ 20 (emphasis in original).

The Terms of Service specifically state that the "'Dispute Resolution' section will survive any termination of this Agreement."  SOF ¶ 21.  The "Dispute Resolution" section incorporates the AAA Commercial Arbitration Rules.[2]  SOF ¶ 22.  The Terms of Service and Privacy Policy also contained several provisions related to Uber's use of Plaintiff's information and communications from Uber and third parties.  SOF ¶ 23.

Users complete the account creation process by clicking the black "NEXT" button on the "Link Card" screen that contains the disclosure that users will be bound by the Terms. SOF ¶ 24.

---

[1] The phrases "Terms of Service" and "Terms and Conditions" are used interchangeably to refer to the Terms governing the relationship between Uber and users of the Uber App.

[2] The AAA Rules provide: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim[.]"  AAA COMMERCIAL ARBITRATION RULES AND MEDIATION PROCEDURES at R-7(a), https://www.adr.org/sites/default/files/Commercial%20Rules.pdf.

la-1357714

### C.     Plaintiff Created An Uber Account on July 8, 2013.

On July 8, 2013, Plaintiff downloaded the Uber App to his Android smartphone and created a rider account.  SOF ¶ 25.  Plaintiff admits he has no reason to believe that the account creation process he experienced was different than what Uber's records show and no reason to dispute Uber's records showing that he completed all steps to create an account.  SOF ¶¶ 26, 27.  Plaintiff admits it is possible he may have (1) seen, (2) clicked on, (3) read, and (4) indicated he accepted Uber's Terms of Service and Privacy Policy during the account creation process.  SOF ¶ 28.

### D.     Plaintiff Continued to Use The Uber App After Creating His Account.

After downloading the Uber App and creating an Uber rider account, Plaintiff continued to use the Uber App on multiple occasions for multiple purposes.  SOF ¶ 33.  Specifically, he used the Uber App to: (1) see how it worked; (2) see what the rates were like; (3) check out the map to see where the cars were; (4) compare if it was "something that [he] needed versus getting a cab"; (5) look at estimated times; and (6) track "cars in the area and how you might hail them."  SOF ¶ 34.  Plaintiff acknowledges that, contrary to his prior interrogatory answers indicating that he never used Uber's services, using the Uber App as he did "could count as using" Uber's services.  SOF ¶ 35.  Although Plaintiff claims he deleted the Uber App from his phone, he does not have any documentary evidence to support that claim.[3]  SOF ¶ 38.  Plaintiff has never made any attempt to cancel his Uber account by contacting Uber or otherwise.  SOF ¶ 37.

### III.    PROCEDURAL HISTORY

Plaintiff filed this putative class action lawsuit on May 23, 2016.  Plaintiff alleges that Uber sent an "unsolicited text message" to his wireless phone "to recruit Plaintiff to become a driver for Uber's transportation app."[4]  (ECF No. 1, ¶¶ 25, 28, 53.)  On July 15, 2017, Uber

---

[3] Plaintiff's response to Uber's request for inspection indicated that Plaintiff performed a factory reset for the phone on which he used the Uber app.  After Uber successfully moved to compel Plaintiff to produce this phone, Uber's experts performed a forensic investigation of the phone, which confirmed that Plaintiff's phone has been wiped of any relevant information.

[4] Uber disputes the allegations in the complaint, including the allegation that Uber sent the text message at issue, and denies liability under the TCPA, but acknowledges that for purposes of this motion, the Court evaluates the propriety of arbitration in the context of Plaintiff's allegations.  *See Double*

4

moved to compel Plaintiff to arbitrate his claims pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4.  (ECF Nos. 15-17.)  Relying on both Illinois and California law,[5] the Court denied Uber's motion to compel arbitration without prejudice on March 13, 2017.  (ECF No. 35, p. 4.) The Court stated it did not have the necessary facts to resolve the motion because the record did not contain evidence showing the account creation process in effect at the time Plaintiff admits he created an Uber account, on July 8 2013.[6]  (ECF No. 35, pp. 3-4.)  The Court ordered "the parties to engage in expedited discovery limited to the issue of formation of the arbitration agreement."  (ECF No. 35, p. 4).

## IV.    LEGAL STANDARD

Summary judgment is appropriate when the pleadings and admissions on file, along with any affidavits, show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Oates v. Discovery Zone,* 116 F.3d 1161, 1165 (7th Cir. 1997) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)). "The inquiry to be made on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law."  *Bruns v. Nw. Steel & Wire Co.,* 869 F. Supp. 583, 588 (N.D. Ill. 1994).

---

*Sunrise, Inc. v. Morrison Mgmt. Specialist, Inc.,* 149 F. Supp. 2d 1039, 1043 (N.D. Ill. 2001) ("In deciding whether a particular claim comes within the scope of an arbitration agreement, the focus is on the factual allegations of the complaint.").

[5] In its motion, Uber demonstrated that its Terms and Conditions contain a choice of law clause requiring the application of California law here.  (ECF No. 16, p. 5 n.3.)  Uber primarily cited California and federal law, but noted that the result would be the same under Illinois law.  *Id.*  Plaintiff did not suggest there was a difference between California and Illinois law.  (ECF No. 25, p. 7 n.4.)

[6] Uber previously submitted a declaration describing the account creation process on the then-current version of the Uber App and maintains that the differences between the processes are not material for this analysis and do not change the result; under both processes, the arbitration provision is enforceable.  (ECF No. 35, p. 3.)  In light of the Court's Order (ECF No. 35), however, during the discovery period, Uber was able to recreate the process as it existed on July 8, 2013, the day Plaintiff downloaded the Uber App and created a rider account.

5

## V.     PLAINTIFF AGREED TO INDIVIDUALLY ARBITRATE HIS CLAIM.

The Federal Arbitration Act ("FAA") mandates that courts enforce valid, written arbitration agreements.  (ECF No. 35, pp. 1-2, citing *Tinder v. Pinkerton Security*, 305 F.3d 728, 733 (7th Cir. 2002); *see also* 9 U.S.C. § 2 [The FAA provides that contractual arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."]).   "[T]he FAA [] was designed to promote arbitration," it "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).

"As the Supreme Court repeatedly has emphasized, arbitration is a creature of contract." (ECF No. 35, p. 2 [citation omitted].)  Whether a binding arbitration agreement exists is determined under principles of state contract law.  *Tinder*, 305 F.3d at 735.  A court must enforce an agreement to arbitrate as it would any other contract and the basic principles of contract formation do not change merely because the parties made their agreement by modern electronic communication.  *Cullinane v. Uber Technologies, Inc.*, No. 14-14750-DPW, 2016 WL 3751652, *6 (D. Mass. July 11, 2016).  Once the movant has made a *prima facie* showing that an arbitration agreement exists, the burden shifts to the opposing party to negate the existence of such an agreement.  *Wal-Mart Stores, Inc. v. Helferich Patent Licensing, LLC*, 51 F. Supp. 3d 713, 717-18 (N.D. Ill. 2014).

### A.     Uber's Account Creation Process Provided Plaintiff Reasonable Notice of The Agreement.

"[A] consumer [must] be provided reasonable notice of all the terms and conditions of an agreement as well as reasonable notice that, by clicking a button, the consumer is assenting to the agreement."  (ECF No. 35, p. 2 [citations omitted].)  "In considering the question of reasonable conspicuousness, precedent and basic principles of contract law instruct that we consider the perspective of a reasonably prudent smartphone user."  *Meyer v. Uber Technologies, Inc.*, ---

6

F.3d ---, 2017 WL 3526682, at *7 (2d Cir. Aug. 17, 2017), citing *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 124 (2d Cir. 2012).

>   1.      **Numerous Courts Have Confirmed The Validity of Uber's Account Creation Process.**

Numerous courts have held that Uber's account creation process provides reasonable notice of Uber's Terms of Service where the process was substantially similar, if not nearly identical. For example, last month, the Second Circuit vacated a district court decision on which Plaintiff heavily relied in opposing Uber's original motion to compel arbitration. *See Meyer v. Kalanick*, 200 F. Supp. 3d 408 (S.D.N.Y. 2016), *vacated by Meyer*, 2017 WL 3526682, at *1. The Second Circuit held that, contrary to the district court's ruling, Uber's account creation process provided reasonable notice of the arbitration provision and must be enforced. *Meyer*, 2017 WL 3526682, at *9.

The account creation process in *Meyer* is materially identical to the process here. In both, the user was required to click a button to create an account, which was located on the same screen as the following text: "'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY,' with hyperlinks to the Terms of Service and Privacy Policy." 2017 WL 3526682, at *6; SOF ¶ 15. Additionally, the screen in *Meyer* was "uncluttered, with only fields for the user to enter his or her credit card details, buttons to register for a user account or to connect the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." 2017 WL 3526682, at *8. Here, the screen presented to Plaintiff was even less cluttered as it did not include the "PayPal" or "Google Wallet" icons, so the relevant disclosure was even more conspicuous: "By creating an Uber account, you agree to the Terms of Service & Privacy Policy." SOF ¶ 15. Notably, in both cases, "the entire screen [was] visible at once, and the user [did] not need to scroll beyond what is immediately visible to find notice of the Terms of Service." 2017 WL 3526682, at *8; SOF ¶¶ 10, 15. Finally, the notice of Terms of Service was "provided simultaneously to enrollment, thereby connecting the contractual terms to

7

the services to which they apply" such that "a reasonably prudent smartphone user would understand that the terms were connected to the creation of a user account." *Id.* The *Meyer* court concluded that "the design of the screen and language used render the notice provided reasonable as a matter of California law." 2017 WL 3526682, at *8.

Similarly, in *Cullinane*, the district court compelled individual arbitration where the plaintiff was "presented with a button or link to view terms of use" when creating an Uber account from a smartphone and "[t]he language surrounding the button leading to the Agreement [was] unambiguous in alerting the user that creating an account will bind her to the Agreement." 2016 WL 3751652, at *8. And, in *Cordas*, the court held that "[b]y creating an account on the Uber app, [the user] 'affirmatively acknowledge[d] the agreement' and is bound by its terms" where the user had to click a button to complete the sign-up process on a screen displaying notice of the terms. *Cordas v. Uber Technologies, Inc.*, 228 F. Supp. 3d 985, 990 (N.D. Cal. 2017).

Plaintiff's experience here was no different than that of the plaintiffs in *Meyer*, *Cullinane*, and *Cordas.* Uber's placement of the phrase "By creating an Uber account, you agree to the Terms of Service & Privacy Policy" on the final screen of the account registration process was sufficient as a matter of law to put a reasonable user on notice of the terms of the agreement. SOF ¶ 15. Because the existence of, and the need to accept and consent to, the Terms of Service were reasonably conspicuous to him, Plaintiff is bound by the Agreement. SOF ¶¶ 9-18.

## 2. Numerous Courts Have Enforced Arbitration Agreements Involving Substantially Similar Facts.

In cases not involving Uber, courts have also recognized that customers are on notice of the terms to which they are assenting (including arbitration provisions) where they are given an opportunity to review and confirm agreement with those terms. *See, e.g.*, *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 908 (N.D. Cal. 2011) (user bound because she was told that, "By using YoVille, you also agree to the YoVille [hyperlink] Terms of Service"); *DeJohn v. The TV Corp. Int'l*, 245 F. Supp. 2d 913, 919 (N.D. Ill. 2003) (upholding website terms of use where

8

the user was given an opportunity to review and indicate acceptance); *Nicosia v. Amazon.com, Inc.*, 84 F. Supp. 3d 142, 150 (E.D.N.Y. 2015) (customer bound by contract terms where website stated: "By placing your order, you agree to Amazon.com's privacy notice and conditions of use," which were hyperlinked); *Starke v. Gilt Groupe, Inc.*, No. 13 Civ. 5497(LLS), 2014 WL 1652225, at *3 (S.D.N.Y. Apr. 24, 2014) (same).

The above cases and their reasoning compel the same result here.

**B.     Plaintiff Agreed To Uber's Terms of Service When He Created An Account.**

"An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Mohammed v. Uber Technologies, Inc.*, No. 16 C 2537, 2017 WL 590289, at *5 (N.D. Ill. Feb. 14, 2017), citing *Wigod v. Wells Fargo Bank, N.A.,* 673 F.3d 547, 561 (7th Cir. 2012) (quoting Restatement (Second) of Contracts § 24 (1981)).  Acceptance occurs, and a contract is created, when the offeree assents in the manner invited or required by the offer.  *See* Restatement (Second) of Contracts § 50(1).  Acceptance is conveyed through an "outward manifestation of assent to be bound by words or acts."  *Mohammed*, 2017 WL 590289, at *5, citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1034 (7th Cir. 2016).  "Courts around the country have recognized that [an] electronic 'click' can suffice to signify the acceptance of a contract." *Sgourous*, 817 F.3d at 1033-34.

It is undisputed that Plaintiff downloaded the Uber App and created an Uber rider account on July 8, 2013.  SOF ¶ 25, 27.  Uber offered Plaintiff the opportunity to create an account only upon the condition that he agree to Uber's hyperlinked Terms of Service.  SOF ¶ 15; *Meyer*, 2017 WL 3526682, at *9 ("the text on the Payment Screen . . . expressly warned the user that by creating an Uber account, the user was agreeing to be bound by the linked terms.").  Plaintiff agrees that hyperlinks are a way for companies to put consumers on notice of "readily available" legal documents.  SOF ¶ 7.  The hyperlink presented to Plaintiff here clearly and conspicuously directed him to the Terms of Service.  SOF ¶¶ 15, 18.  Plaintiff did not need to scroll or click to a separate screen to be advised of Uber's Terms of Service.  SOF ¶ 17.  Upon

9

being prompted that, "[b]y creating an Uber account [he] agree[d] to the Terms of Service & Privacy Policy," Plaintiff proceeded to create an account. SOF ¶¶ 15, 25.

By creating an account, Plaintiff agreed to be bound by Uber's Terms of Service, including the arbitration provision contained therein. *See Meyer*, 2017 WL 3526682, at *9 ("A reasonable user would know that by clicking the registration button, he was agreeing to the terms and conditions accessible via the hyperlink[.]"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004) ("[R]egardless whether [a user] did or did not say, 'I agree' . . . [the user's] choice was either to accept the offer of contract, taking the information subject to the terms of the offer, or, if the terms were not acceptable, to decline to take the benefits."). Plaintiff indisputably was put on notice of the Terms & Conditions and indicated his assent thereto by creating his Uber account. SOF ¶¶ 9-18, 25.

### C. Plaintiff Use of Uber's Services Confirms He is Bound by the Arbitration Agreement.

Plaintiff agreed to arbitrate any claims against Uber the moment he created his Uber account. The point of assent to the contract is clear: "By creating an Uber account, ....." SOF ¶ 15. The consideration for Plaintiff's agreement to Uber's Terms of Service was his opportunity to schedule a ride through the Uber platform and his ability to log in to the Uber App and access features only available to account holders. *Meyer*, 2017 WL 3526682, at *9 ("The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship."). Plaintiff's purported decision not to exercise that right does not defeat contract formation. *See, e.g.*, *Patton v. Jonas*, 249 F.2d 375, 378 (7th Cir. 1957) ("Obviously, the mere fact that an obligee may never exercise his right does not in the least detract from the binding effect of an obligation to perform.").

In any event, Plaintiff continued to use Uber's services even after creating an account. Plaintiff testified that after he downloaded the Uber App and created a rider account, he used the

10

Uber App to (1) "see[] how it worked;" (2) see what the rates were like; (3) check out the map to see where the cars were; (4) compare if it was "something that [he] needed versus getting a cab"; (5) look at estimated times; and (6) track "cars in the area and how you might hail them." SOF ¶¶ 33, 34. Plaintiff admitted that, given these uses, his prior statements of "never using" Uber's services required clarification, and that using the Uber App in the manner he did, "could count as using" Uber's services. SOF ¶ 35. The Terms of Service confirmed that Plaintiff was bound to those Terms as soon as he used Uber's Services to create an account and further used Uber's Services in exploring the features available only to account holders. SOF ¶ 19 (*see, e.g.*, "[b]y using or receiving any services supplied to you by the Company (collectively, the "Service"), and downloading, installing or using any associated application supplied by the Company which purpose is to enable you to use the Service (collectively, the "Application"), you hereby expressly acknowledge and agree to be bound by the terms and conditions of the Agreement[.]"); SOF ¶ 36 (registration "is one of the usage events" for the Uber App). There can be no doubt that Plaintiff agreed to be bound by the Terms of Service when he created his account and subsequently continued to use the Uber App.[7]

**D.      Plaintiff is Bound Even if He Did Not Click On The Hyperlink or Read The Terms of Service.**

The law does not require that a plaintiff be presented with or forced to review the terms and conditions before he is bound by them. *Starke*, 2014 WL 1652225, at *2-3. ("Whether or

---

[7] Notably, although Plaintiff claims to have deleted the Uber App from his mobile device, Plaintiff did not delete his Uber account or contact Uber to request his account be closed. SOF ¶¶ 37, 38. Even if he did—and if such an action were found to terminate his agreement with Uber—the text message at issue in Plaintiff's TCPA claim must still be arbitrated. The presumption that an arbitration provision in a contract survives the termination of that contract can be overcome only by "clear evidence that the parties intended to override this presumption." *Shipp v. XA, Inc.*, No. 06 C 1193, 2006 WL 2583720, at *7 (N.D. Ill. Aug. 31, 2006). Here, the Terms of Service specifically states that the "'Dispute Resolution' section will survive any termination of this Agreement." SOF ¶ 21. Plaintiff has not and cannot offer any evidence to override the presumption that the arbitration agreement survives the alleged deletion of the Uber App from his mobile device. Further, it would defy logic to find that by deleting the Uber App from his mobile device, Plaintiff has terminated his agreement with Uber. Such an interpretation would enable one to avoid the agreement by unilaterally deleting the Uber App from their device at any time and without any notice to Uber, despite the fact that he or she could still access their account to use Uber's services from another device or computer, or could reinstall the Uber App at any time.

not the consumer bothers to look is irrelevant."); *Swift*, 805 F. Supp. 2d at 908 ("no record of whether Plaintiff or anyone else ever clicked on the blue hyperlinked [terms]").

First, Plaintiff is bound by the terms he agreed to during Uber's account creation process even though he was not required to click on the hyperlink. "That the Terms of Service were available only by hyperlink does not preclude a determination of reasonable notice." *Meyer*, 2017 WL 3526682, at *8, citing *Fteja v. Facebook*, 841 F. Supp. 2d 829, 839 (S.D.N.Y. 2012) ["[C]licking [a] hyperlinked phrase is the twenty-first century equivalent of turning over the cruise ticket. In both cases, the consumer is prompted to examine terms of sale that are located somewhere else."). "As long as the hyperlinked text was itself reasonably conspicuous . . . a reasonably prudent smartphone user would have constructive notice of the terms." *Meyer*, 2017 WL 3526682, at *8. The *Meyer* Court held that "the language '[b]y creating an Uber account, you agree' is a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms." *Id*. Similarly, here, Uber's account creation process included the same clear prompt directing users to read the Terms of Service. SOF ¶ 15.

Second, Plaintiff is bound by the terms he agreed to even though he may not have read them. "While it may be the case that many users will not bother reading the additional terms, that is the choice the user makes; the user is still on inquiry notice." *Meyer*, 2017 WL 3526682, at *8; *see also DeJohn*, 245 F. Supp. 2d at 919 ("[f]ailure to read a contract is not a get out of jail free card."); *Swift*, 805 F. Supp. 2d at 911-12 (enforcing arbitration clause contained in hyperlinked Terms of Service, where there was no evidence that plaintiffs actually viewed terms); *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1137 (N.D. Cal. 2015) ("the terms of the agreement are binding, even if the user did not actually review the agreement[.]"). Clicking the button to create his account (which Plaintiff does not deny) was the electronic equivalent of Plaintiff affixing his signature to an agreement even if he did not tap on the hyperlink and even if he does not remember one way or another. *Leong v. Myspace, Inc.* No. CV 10-8366 AHM (Ex), 2011 WL 7808208, at *5 (C.D. Cal. Mar. 11, 2011) (plaintiff on notice

12

where "[t]he text of the Agreement was only a mouse-click away, but [plaintiff] apparently chose not to read its contents").  Because Plaintiff was provided with an opportunity to review the Terms and Conditions to which he would be bound via a conspicuous hyperlink on the same screen used to complete the registration process, he entered into a valid agreement to arbitrate. SOF ¶¶ 9-20, 24.

> **E.     Plaintiff's Inability To Recall Creating His Account Does Not Nullify His Agreement.**

Plaintiff cannot escape his contractual obligations by declaring, years after he created an account (a fact he admits), that he does not recall certain steps of the account creation process. That is not the law.  *Blau v. AT&T Mobility,* No. C 11-00541 CRB, 2012 WL 10546, at *4 (N.D. Cal. 2012) ("If a party could get out of a contract by arguing that he did not recall making it, contracts would be meaningless.").  Although Plaintiff testified that he does not have a specific recollection of the process he went through to create an Uber account four years ago, his inability to recall the process cannot nullify his agreement.  Indeed, although at his deposition Plaintiff could not recall entering his payment information during the account creation process, Plaintiff testified that he used a Chase debit card at the time he created an Uber account, and Uber's records show that the payment linked to Plaintiff's account was a Chase debit card.  SOF ¶¶ 30-32.  Given that Plaintiff does not dispute that he signed up for an Uber account and does not dispute the information in Uber's contemporaneously-created records, he cannot come close to carrying his burden of negating his agreement to arbitrate based on his inability to recall the account creation process.

> **F.     The Arbitration Agreement Encompasses Plaintiff's TCPA Claim.**

The FAA requires that courts compel arbitration "unless it may be said with ***positive assurance*** that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute."  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (emphasis added).  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in

favor of arbitration[.]" *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

The Terms of Service broadly define the scope of arbitrable disputes to include "**any dispute, claim or controversy arising out of or relating to** this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application[.]" SOF ¶ 20. The "arising out of or relating to" language is construed broadly in favor of arbitration. *See Paragon Micro, Inc. v. Bundy*, 22 F. Supp. 3d 880, 891 (N.D. Ill. 2014) ("[T]he Seventh Circuit has repeatedly held that the language 'arising out of' and 'relating to' is extremely broad and creates a 'presumption of arbitrability' that 'reaches all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se.") (citations omitted). In the face of an arbitration provision with "relating to" language, "Plaintiff's claims need only 'touch matters' covered by the contract[.]" *Koyoc v. Progress Fin. Co.*, No. CV 13-09165-RSWL (AGRx), 2014 WL 1878903, at \*4 (C.D. Cal. May 9, 2014) (citation omitted); *accord CK Witco Corp. v. Paper Allied Indus.*, 272 F.3d 419, 422 (7th Cir. 2001).

The arbitration agreement leaves no doubt that Plaintiff's claims falls squarely within its scope. The Terms of Service and Privacy Policy to which Plaintiff agreed contained several provisions related to Uber's use of Plaintiff's information and communications from Uber and third parties. SOF ¶ 23; *see Lainer v. Uber Technologies, Inc.*, No. 2:15-cv-09925-BRO-MRW (C.D. Cal.), ECF No. 25, at pp. 4, 6 (enforcing a materially identical arbitration provision based on an alleged TCPA violation for the transmission of a text regarding an opportunity to drive for Uber). But even if there is any ambiguity whether the text messages at issue are covered by the arbitration agreement, disputes regarding the existence and scope of the agreement must be resolved by the arbitrator. SOF ¶ 22. Because the arbitration provision delegates questions of arbitrability to the arbitrator, any dispute over the interpretation of the Terms of Service must be referred to arbitration to be decided by the arbitrator. *See, e.g., Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201, 1208-1209 (9th Cir. 2016) (holding that the Uber Terms and Conditions for

14

la-1357714

drivers, which contain a similar delegation clause to the one Plaintiff agreed to, "clearly and unmistakably delegated the question of arbitrability to the arbitrator[.];" *Cullinane*, 2106 WL 3751652, at *9-10 (holding that the Uber Terms and Conditions for riders are governed by the AAA Rules and, therefore, the court "must compel arbitration, and leave all other matters for the arbitrator to decide.").

## VI.    CONCLUSION

Congress's "clear intent" in enacting the FAA was "to move the parties to an arbitrable dispute out of court and into arbitration as quickly and easily as possible." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22-25 (1983).  Plaintiff can no longer delay enforcement of his valid and binding agreement to arbitrate his claims against Uber.  Binding precedent and the undisputed facts compel the Court to direct Plaintiff to resolve this dispute in individual arbitration.  For the foregoing reasons, Uber respectfully requests that the Court grant summary judgment in its favor and compel arbitration.

Dated: September 1, 2017                                    Respectfully submitted,

By: /s/ Tiffany Cheung
***Attorney for Defendant
Uber Technologies, Inc.***

Tiffany Cheung (admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
(415) 268-7000
tcheung@mofo.com

Kelsey M. Stricker (admitted *Pro Hac Vice*)
MORRISON & FOERSTER LLP
707 Wilshire Boulevard
Los Angeles, California 90017-3543
(213) 892-5200
kstricker@mofo.com

John C. Ellis
ELLIS LEGAL P.C.
250 S. Wacker Dr., Suite 600
Chicago, Illinois 60606

la-1357714

(312) 976-7629
jellis@ellislegal.com

16

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that a copy of the foregoing Memorandum of

Law in Support of Defendant Uber Technologies, Inc.'s Motion for Summary Judgment was

served on Plaintiff's counsel via the Court's CM/ECF system on this 1st day of September, 2017.


By: /s/ Tiffany Cheung
     Attorney for Defendant
     Uber Technologies, Inc.

17