IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHARLES CHRISTOPHER JOHNSON, individually and as the representative of a class of similarly-situated persons, | ) ) ) ) |
| Plaintiff, | ) 16 C 5468 ) |
| v. | ) Judge John Z. Lee ) |
| UBER TECHNOLOGIES, INC., | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charles Johnson, on behalf of himself and as representative of a putative class, has sued Defendant Uber Technologies, Inc. ("Uber") for allegedly sending him an unsolicited text message in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227. The parties have cross-moved for summary judgment as to whether they agreed to arbitrate this dispute. For the following reasons, Uber's motion is granted [56], and Johnson's motion is denied [75]. The class claims are dismissed without prejudice, and this case is stayed pending the resolution of arbitration proceedings.

### Factual Background

The following facts are undisputed. Johnson is a college graduate who works as a freelancer in animation, production, and art management. Def.'s LR 56.1(a)(3) Stmt. ¶¶ 1–2, ECF No. 58. His job involves working with technology, software, and mobile applications ("apps"). *Id.* ¶ 3. Johnson has downloaded apps on his phone and

is familiar with the type of sign-up process that involves agreeing to the terms and conditions required by the entity providing the app. *Id.* ¶ 4.

Uber is a software technology company. *Id.* ¶ 8. Uber's software application ("Uber app") enables smartphone users to request rides from third-party drivers. *Id.*

On July 8, 2013, Johnson downloaded the Uber app to his Android-operated smartphone. *Id.* ¶ 25. He then completed each of the steps required to create an Uber account. *Id.* ¶¶ 25–27; *see* Pl.'s Ex. B, Mi Dep. Ex. 6, Johnson Analytics, ECF No. 77-2.

According to Vincent Mi, Uber's Senior Software Engineer, Johnson used a sign-up process that required him to complete certain steps through screens entitled: (1) Create an Account, (2) Create a Profile, and (3) Link Card. Def.'s LR 56.1(a)(3) Stmt. ¶ 9. No scrolling was required to view content on any of the three screens. *Id.* ¶ 10. The user is required to fully complete each screen before proceeding to the following screen. *Id.* ¶ 11.

On the initial "Create an Account" screen, the user inputs in an email address, mobile phone number, and password. *Id.* ¶ 12. After providing that information, the user is prompted to click on the text of the "Next" button, which appears in the upper-right corner. *Id.* After clicking this button, the user is directed to the "Create a Profile" screen, which contains fields for the user's first and last names. *Id.* ¶ 13. Once these fields are completed, the user is again prompted to click on the text of the "Next" button that appears in the upper-right corner. *Id.* ¶ 14.

After clicking the "Next" button, the user then is directed to the "Link Card" screen. *Id.* This screen contains a total of five lines of content. *Id.* ¶ 15. The first line is a field for a credit or debit card number. *Id.* The second line features the text "scan your card" and "enter promo code." *Id.* The third line states: "This card will only be charged when you request an Uber." *Id.* The fourth and fifth lines at the bottom of the screen warn that "[b]y creating an Uber account, you agree to the Terms of Service & Privacy Policy." *Id.* This statement appeared in an easy-to-read font. *Id.* Additionally, the words, "Terms of Service & Privacy Policy," are contained in an outlined box, indicating a hyperlink that, when clicked, brings the user to a screen displaying Uber's Terms of Service in effect at the time. *Id.* ¶¶ 15, 18.

When Johnson created an Uber account, the first paragraph of the Terms of Service provided the following:

> In order to use the Service . . . and the associated application . . . you must agree to the terms and conditions that are set out below. By using or receiving any services supplied to you by the Company (collectively, the "Service"), and downloading, installing or using any associated application supplied by the Company which purpose is to enable you to use the Service (collectively, the "Application"), you expressly acknowledge and agree to be bound by the terms and conditions of the Agreement and any future amendments and additions to this Agreement as published from time to time at https://www.uber.com/terms or through the Service.

Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 19, ECF No. 77. The Terms of Service defined "use" as "access[ing] or us[ing] the Service or Application." Def.'s Ex. D, Terms and Conditions updated May 17, 2013, ECF No. 63.

3

The Terms of Service also included a section entitled "Dispute Resolution," which stated in the first paragraph:

> You and Company agree that any dispute, claim or controversy arising out of or relating to this Agreement or the breach, termination, enforcement, interpretation or validity thereof or the use of the Service or Application (collectively, "**Disputes**") will be settled by binding arbitration, except that such party retains the right to bring an individual action in small claims court and the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. **You acknowledge and agree that you and Company are each waiving the right to a trial by jury or to participate as a plaintiff or class User in any purported class action or representative proceeding.**

Def.'s LR 56.1(a)(3) Stmt. ¶ 20 (emphasis in original).

Johnson admits it is possible that he may have seen, clicked on, read, and indicated that he accepted Uber's Terms of Service & Privacy Policy when he created his Uber account, but he does not recall doing so. *Id.* ¶ 28. However, it is worth noting that, although Johnson also could not recall entering payment information when he created an account, it is undisputed that Uber's records show that Johnson submitted his Chase debit card information on the "Link Card" screen. *Id.* ¶¶ 29, 32.

Within a few days of creating the account, Johnson opened the Uber app to see how it worked, to see what the rates were like, to check out the map to see if Uber drivers were in his area, to look at drivers' estimated arrival times, and to generally determine whether the app was useful in comparison to hailing a cab. *Id.* ¶ 34. That

4

said, Johnson never requested a ride using the Uber app. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 46, ECF No. 77.

Johnson claims to have deleted the Uber app from his phone, but he does not have any documentary evidence to support that assertion. Def.'s LR 56.1(a)(3) Stmt. ¶ 38. Johnson claims that afterwards, Uber sent a single unsolicited text message to his mobile phone number asking him whether he wanted to sign up to be an Uber driver. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 52.

## **Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Shell v. Smith*, 789 F.3d 715, 717 (7th Cir. 2015). To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 773 (7th Cir. 2012).

The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). The Court gives the nonmoving party "the benefit of conflicts in the evidence

5

and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

Moreover, Federal Rule of Civil Procedure 56 requires a court to grant a summary judgment motion "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of establishing that there is no genuine issue of material fact. *See id.* Once the moving party has sufficiently demonstrated the absence of a genuine issue of material fact, the nonmoving party must then set forth specific facts showing there are disputed material facts that must be decided at trial. *See id*. at 321–22.

## Analysis

The Federal Arbitration Act ("FAA") was enacted to "reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991)). "The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 289 (2002). Pursuant to the FAA, courts are mandated to enforce valid, written arbitration

6

agreements. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002) (citing 9 U.S.C. § 2).

To this end, "arbitration is a creature of contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016). It is "well settled that where the dispute at issue concerns contract formation, the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010); *see Mohammed v. Uber Techs., Inc.*, 237 F. Supp. 3d 719, 726–28 (N.D. Ill. 2017).

Whether an agreement to arbitrate has been formed is governed by state law. *Sgouros*, 817 F.3d at 1034. Because neither party contends there is a difference between California or Illinois law, the Court need not perform a choice-of-law analysis and will apply the law of the forum state. *See Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1271 n.3 (7th Cir. 1996); *see also Nationwide Advantage Mortg. Co. v. GSF Mortg. Corp.*, 827 F.3d 577, 580 (7th Cir. 2016).

Illinois law requires that a consumer be provided reasonable notice of all the terms and conditions of an agreement as well as reasonable notice that, by clicking a button, the consumer is assenting to the agreement. *See Sgouros*, 817 F.3d at 1034–36. "This is a fact-intensive inquiry: we cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)." *Id.* at 1034. As part of this inquiry, the court considers whether a reasonable person would be misled, confused, misdirected, or distracted by the manner in which the terms and conditions are presented. *Id.*

The Court finds *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 118–19 (Ill. App. Ct. 2005), instructive. In that case, a putative class sued Dell for deceptive advertising after purchasing computers through Dell's website, and Dell moved to compel arbitration.[1] *Id.* The court held that the statement "All sales are subject to Dell's Term[s] and Conditions of Sale," which appeared on web forms the plaintiffs completed to make their purchases, "would place a reasonable person on notice that there were terms and conditions attached to the purchase and that it would be wise to find out what the terms and conditions were before making a purchase." *Id.* at 118, 122. The court further held that the statement, when combined with the accessibility of the terms and conditions via hyperlinks, "was sufficient notice to the plaintiffs that purchasing the computers online would make the 'Terms and Conditions of Sale' binding on them." *Id.* at 122.

Similar to Dell's website in *Hubbert*, the app that Johnson used to create his Uber account included the following statement: "By creating an Uber account, you agree to the Terms of Service & Privacy Policy." *See* Def.'s LR 56.1(a)(3) Stmt. ¶ 15. The statement appeared in an easy-to-read font on an uncluttered screen, and no scrolling was required to view it. *Id.* ¶¶ 10, 15, 17. The words "Terms of Service & Privacy Policy" in the statement also served as a hyperlink, which appeared in a larger-sized font, enclosed in an outlined box. *See id.* The hyperlink, when clicked,

---

[1] While the Illinois Appellate Court applied Texas law, it held that regardless of whether Texas or Illinois law applied, there would "be no substantial difference in the outcome." *Id.* at 120; *see Sgouros*, 817 F.3d at 1035 (applying Illinois law and stating "[t]he closest Illinois case on point is *Hubbert v. Dell Corp.*, 359 Ill. App. 3d 976, 296 Ill. Dec. 258, 835 N.E.2d 113 (2005).").

brought the user to a screen displaying Uber's Terms of Service in effect at the time. *Id.* ¶¶ 15, 18. As in *Hubbert*, the Court holds that the manner in which this statement and the Terms of Service were presented placed a reasonable person on notice that there were terms incorporated with creating an Uber account and that, by creating an account, he or she was agreeing to those terms.

The cases upon which Johnson relies are readily distinguishable. *See Sgouros*, 817 F.3d at 1035 (denying motion to compel arbitration where the web pages completed to make a purchase "contained no clear statement that [the] purchase was subject to any terms and conditions of sale" and moreover, actively misled the customer); *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014) (denying motion to compel arbitration where website did not prompt user to click on the hyperlink to terms and conditions before purchasing product); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 32 (2d Cir. 2002) (denying motion to compel arbitration where website lacked "reasonably conspicuous notice that the [users were] . . . about to bind themselves to contract terms"). Unlike the websites in those cases, the Uber app contained a clear and conspicuous statement that, by creating an Uber account, a user agreed to the Terms of Service & Privacy Policy and prompted the user to click the hyperlink by displaying it prominently in an outlined box.

The Court finds the reasoning in *Meyer v. Uber Technologies, Inc.*, 868 F.3d 66 (2d Cir. 2017), persuasive. In that case, the Second Circuit held that, under California law, the plaintiff had agreed to a mandatory arbitration clause by creating an account using a version of Uber's smartphone app that contained the same

9

statement and hyperlink as in this case. *See id.* at 80. In particular, the *Meyer* court concluded that "the Payment Screen provided clear notice that there were terms that governed" and that by creating an Uber account, the plaintiff "was agreeing to the terms and conditions accessible via the hyperlink, whether he clicked on the hyperlink or not." *Id.* at 79–80. The court therefore vacated the district court's denial of the motion to compel arbitration. 868 F.3d at 81. As in *Meyer*, the Court holds that the "Link Card" screen expressly warned that, by creating an account, the user was agreeing to be bound by the Terms of Service accessible via the hyperlink. Furthermore, a reasonable user would know that, by entering his debit or credit card information on that screen, he was creating an Uber account. Finally, the fact that Johnson elected not to read the actual terms of service, when he was given an opportunity to do so, has no probative force. *See Hill v. Gateway 2000, Inc.*, 105 F.3d 1147, 1148 (7th Cir. 1997) ("A contract need not be read to be effective; people who accept take the risk that the unread terms may in retrospect prove unwelcome.").

For all of these reasons, Johnson has failed to raise a genuine dispute as to whether he entered into an enforceable agreement to arbitrate.

Undeterred, Johnson further argues that, even if he did enter into an arbitration agreement, his TCPA claim does not fall within its scope. "Once it is clear, however, that the parties have a contract that provides for arbitration of some issues between them, any doubt concerning the scope of the arbitration clause is resolved in favor of arbitration as a matter of federal law." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012). "To this end, a court may not deny a party's request

to arbitrate an issue 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909 (7th Cir. 1999) (quoting *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83 (1960)).

As Uber points out, the Terms of Service specifically permit Uber to text promotional offers to its customers. See Def.'s Ex. D, at UBER00000015. Because Johnson's TCPA claim may arguably fall within the parameters of this provision, the claim must be arbitrated. *See Lainer v. Uber Techs., Inc.*, No. CV1509925 BROMRWX, 2016 WL 7444925, at *4 (C.D. Cal. May 11, 2016) (granting a motion to compel arbitration of a TCPA claim based on a promotional text to an Uber rider to become an Uber driver and holding that the dispute was within the scope of the arbitration agreement).

In addition, Uber argues that, by agreeing to the broad language in the arbitration clause, the parties have delegated to the arbitrator any determination requiring its interpretation, including whether a dispute falls within the clause's scope. *See* Def.'s Mem. Supp. Summ. J. at 15; Def.'s Reply Br. at 7 n.4. In this regard, "[w]hether a particular dispute must be arbitrated is generally a question for judicial determination, unless the parties clearly and unmistakably provided otherwise in their agreement." *Duthie v. Matria Healthcare, Inc.*, 540 F.3d 533, 536 (7th Cir. 2008); *see Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010).[2]

---

[2] "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA

11

In pertinent part, the Terms of Service provide that "any dispute, claim or controversy arising out of or relating to this Agreement['s]. . . enforcement, interpretation or validity . . . will be settled by binding arbitration . . . ." Def.'s LR 56.1(a)(3) Stmt. ¶ 20. Certainly, a determination of whether Plaintiff's TCPA claim falls within the scope of the arbitration clause necessitates interpretation of the agreement and, thus, is itself subject to arbitration. *See Bergeron v. Monex Deposit Co.*, No. SACV171968JVSDFMX, 2018 WL 3647017, at *2, 4 (C.D. Cal. July 9, 2018) (holding scope-of-arbitration issue was delegated to arbitrator where agreement required arbitration of disputes as to enforcement, interpretation, and validity of the agreement); *Lathan v. Uber Techs., Inc.*, 266 F. Supp. 3d 1170, 1173 (E.D. Wis. 2017) (same); *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 549 (W.D. Tex. 2017) (same).

## Conclusion

For the above-stated reasons, Defendant Uber's summary judgment motion is granted [56], and Johnson's cross-motion for summary judgment is denied [75]. The class claims are dismissed without prejudice, and this case is stayed pending the resolution of arbitration proceedings.

**IT IS SO ORDERED.**  ENTERED  9/20/18

*[signature: John Z. Lee]*

_____
**John Z. Lee**
**United States District Judge**

---

operates on this additional arbitration agreement just as it does on any other." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 70 (2010).